# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO


ANTONIO "TONY" CORDOVA,

        Plaintiff,

vs.                                      CIV 00-1328 KBM/DJS

PNM ELECTRIC AND GAS SERVICES,
a Corporation doing business within the
State of New Mexico,

        Defendant.


# MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant PNM's Motion for Summary Judgment, *Doc. 43,* and the parties' cross-motions to strike evidence each submitted in support of their summary judgment arguments, *Docs. 49, 53.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.

## I. Background

Plaintiff Antonio Cordova ("Cordova"), a Hispanic male, began his employment with Defendant ("PNM") in 1974 as a construction and maintenance helper. Following several promotions, Cordova held the position of "Senior Gas System Technician" from 1995 until his termination in August 1999. PNM terminated his employment after an investigation of reported problem in July 1999 with the gas line in Plaintiff's area of responsibility and subsequent audit of his work performance. Plaintiff alleges that he was discharged based on national origin in

violation of Title VII, 42 U.S.C. § 2000e-2(a)(1); based on his age in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1); and in violation of state

law under theories of breach of express or implied contract, *prima facie* tort, and retaliation for

whistleblowing activity.

## II. Summary Judgment Procedure

### A. *Standard for Consideration of a Motion for Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure provides that it is the movant's burden to

demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 327 (1986). Upon such a showing, the

> adverse party may not rest upon the mere allegations or denials of the [movant's]
> pleading, but the adverse party's response, by affidavits or as otherwise provided
> in this rule, *must set forth specific facts showing that there is a genuine issue for
> trial*. If the adverse party does not so respond, summary judgment, if appropriate,
> shall be entered against the adverse party.

*Id.* at 321-23 (emphasis supplied). Moreover, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of

every action." *Id.*

### B. *Cross-Motions to Strike Exhibits*

Plaintiff moves to strike certain of Defendant's exhibits on the basis that they have not

been properly authenticated and constitute hearsay. Specifically, Plaintiff seeks to strike the

exhibits from the first affidavit of Tom Doles, PNM's District Engineer for the N.E. Region for

the past nine years, and from the affidavit of Danny Deckard, Plaintiff's immediate supervisor at

PNM.

Doles' affidavit establishes that his testimony as to the exhibits is based upon personal knowledge. He is "familiar with PNM's policies concerning the design of regulatory stations, inspection of the stations, proper testing, setting of monitors, and the related reporting procedures requirements," *Doc. 44,* Exh. B, ¶ 3 (hereinafter "Doles1"[1]); is "familiar with the Federal and state pipeline safety laws concerning protection against over-pressuring, control of gas pressure, installation and design of pressure relief devices, and inspection and testing of pressure limiting and regulating stations and relief devices," *id.,* ¶ 4; and took part in the investigation and "prepared a report of the results of the investigation, parts of which are attached hereto as exhibits to my report [as well as] copies of reports filled out by Cordova. *See id.,* ¶ 5. Similarly, Deckard's affidavit states that he was Plaintiff's supervisor for four years and is therefore "familiar with his employment responsibilities and with the training he had in conjunction with his employment." *Id.,* Exh. E, ¶ 3.

The exhibits are thus authenticated by testimony of a witness with knowledge, FED. R. EVID. 901(b)(1), and are admissible as hearsay exceptions under the FED. R. EVID. 803 (1), (5), or (6). Copies of the relevant state statute and federal regulations are self-authenticating under FED. R. EVID. 902(5).[2]

---

[1] One of Doles' affidavits was submitted with Defendant's memorandum in support, *Doc. 44,* Exh. B ("Doles1"), the other with Defendant's reply, *Doc. 46,* Exh. B (hereinafter "Doles2"), each of which have some sealed exhibits that I designate with an "S."

[2] Rule 56 requires that

[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Insofar as the cross-motions to strike deal with the admissibility of the substantive content of affidavit or deposition testimony, I will address those issues later in the context of the issues for which the testimony is offered.

## III.  Federal Claims Are Analyzed Under
## *McDonnell-Douglas* Burden Shifting Framework

### A.  *Plaintiff Establishes Prima Facie Case on Title VII Claim*

Neither party identifies the correct applicable test for a *prima facie* case under Title VII.[3] Because Plaintiff asserts a discriminatory discharge claim, to establish a *prima facie* case Plaintiff must show that:  "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000); *see also e.g., Ortiz v. Norton,* 254 F.3d 889, 895 (10th Cir. 2001); *English v. Colorado Dept. of Corrections,* 248 F.3d 1002, 1008 (10th Cir. 2001).

The Tenth Circuit has repeatedly cautioned that plaintiff's burden at the *prima facie* stage

---

FED. R. CIV. P.  56(e).  Defendant presented another set of affidavits to cure any alleged defects in authentication.  Cordova asserts that these supplemental affidavits are "prejudicial" unless the Court also allows him to submit affidavits.  Yet Plaintiff fails to indicate what is prejudicial about the response affidavits and, moreover, fails to tender reply affidavits or otherwise indicate what they would say.

[3]  In *Kendrick*, the Tenth Circuit clarified that in disciplinary discharge cases, a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial *prima facie* burden under *McDonnell-Douglas*.  *See Kendrick*, 220 F.3d at 1228-29; *see also Guyton v. Ottawa Truck Div.,* 2001 WL 433427 n.2 (10th Cir. 4/27/01) ("Mr. Guyton claims that Ottawa Truck's reasons for terminating him are false, he was disparately treated, and its managers harbor racial animus.  Although he describes this as only a disparate treatment case, it is more accurately characterized as alleging discriminatory discharge" and holding that parties and district court applied inaccurate *prima facie* standard, citing the *Kendrick* elements as the correct test).

4

should not be "onerous." *Ortiz,* 254 F.3d at 895 (internal quotations omitted). There is no dispute that Plaintiff is Hispanic, his position was not eliminated, and Plaintiff need not show that he was replaced by a non-Hispanic as part of this *prima facie* case. *E.g., Kendrick,* 220 F.3d at 1227-1229; *Perry v. Woodward,* 199 F.3d 1126, 1136-1137 (10th Cir. 1999), *cert. denied,* 529 U.S. 1110 (2000). Despite the dispute whether Cordova's conduct merited termination, Plaintiff's long-standing employment with PNM satisfies the "qualifications" second and third prongs.

> Although the district court noted some dispute over the quality of his work, it correctly found that the extensive period of time that [Plaintiff] held his position at least entitles him to an inference of satisfactory performance sufficient to survive summary judgment. *Cf. MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) ("[A] plaintiff may make out a prima facie case of discrimination in a discharge case . . . by evidence that she had held her position for a significant period of time.").

*English,* 248 F.3d at 1008. Plaintiff therefore establishes a *prima facie* case of discriminatory discharge under Title VII.

### B. Plaintiff Establishes Prima Facie Case on ADEA Claim

As for the ADEA claim, Defendant contends that Plaintiff fails to meet two prongs of the requisite *prima facie* case. For Cordova to raise an inference of age discrimination, he must demonstrate the following: (1) at the time he was fired, he was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)); (2) he was otherwise qualified for the position; (3) he was discharged; and (4) his replacement was substantially younger. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

PNM first contends that Plaintiff fails the second prong because the conduct giving rise to

his termination demonstrates that he was not fulfilling his job duties "satisfactorily." The language PNM uses to define the second element ("doing satisfactory work") is taken from *Gonzagowski v. Widnall,* 115 F.3d 744, 749 (10th Cir. 1997), a Tenth Circuit case that predates the *Reeves* decision. In *Reeves*, the Supreme Court required that a plaintiff show that he was "***otherwise qualified*** for the position" – virtually the same language as the parallel prong of the Title VII claim above. *Reeves*, 503 U.S. at 142 (emphasis added). Again, this element is satisfied by Plaintiff's long work history with the company. *See Munoz v. St. Mary-Corwin Hosp.,* 221 F.3d 1160, 1165 (10th Cir. 2000).[4]

Cordova was fifty-six when he was fired and his replacement was a forty-eight year old Hispanic male. It is immaterial whether the replacement was also within the protected age group. Rather, the critical inquiry is whether "a replacement is ***substantially younger*** than the plaintiff." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313 (1996) (emphasis added).

What age difference is considered sufficient to raise a presumption that age motivated the decision to terminate an employee? In the Tenth Circuit, a two-year difference is insufficient to meet the fourth prong. *Munoz,* 221 F.3d at 1166 ("replacement was only two years his junior - an obviously insignificant difference - the necessary inference of discrimination was precluded"). Other circuits choose age difference benchmarks anywhere from three to ten years. *E.g., Damon v. Fleming Supermarkets Of Florida, Inc.,* 196 F.3d 1354, 1360 (11th Cir. 1999) (five years

---

[4] Inquiry into a plaintiff's work performance may not appropriate at the *prima facie* stage of an age discrimination claim. Many Tenth Circuit decisions hold that a Defendant cannot assert the reasons for termination as a basis for finding that Plaintiff was not "otherwise qualified" to perform the position. *E.g., Ortiz,* 254 F.3d at 895 (discussing *MacDonald v. Eastern Wyoming Mental Health Ctr.,* 941 F.2d 1115, 1119 (10th Cir. 1991) and also citing *EEOC v. Horizon/CMS Healthcare Corp,* 220 F.3d 1184, 1193 (10th Cir. 2000)).

sufficient), *cert. denied,* 529 U.S. 1109 (2000); *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887,

893 (7th Cir. 1997) (ten year difference presumptively substantial in Seventh Circuit; eight year

difference, although sufficient in the Third Circuit's view, is <u>not</u> considered "substantially

younger" by the District of Columbia Circuit Court of Appeals).  In the absence of controlling

authority to the contrary and cognizant of the Tenth Circuit's admonition that burden at the *prima*

*facie* stage should not be onerous, I will assume that the eight-year disparity meets Plaintiff's

burden on the fourth prong.[5]

### C.  Defendant Articulates Legitimate Reasons For Plaintiff's Dismissal

Defendant next bears the burden of offering a facially non-discriminatory reason for its

decision to terminate Plaintiff.  *E.g., Munoz,* 221 F.3d at 1167; *Kendrick,* 220 F.3d at 1230.

Defendant offers several reasons, that Plaintiff

(1)     failed to conduct required pressure tests on critical pressure relief valves;
(2)     failed to properly set relief valve and monitors at or below required maximum operating pressures;
(3)     failed to conduct required inspections on gas regulators and relief valves;
(4)     failed to repair, replace or report broken, damaged or badly worn parts and equipment;
(5)     failed to report that some stations under his responsibility had no over-pressurization protection whatsoever;
(6)     falsified Company records indicating that he had performed tests and inspections which he had not conducted;
(7)     falsely reported that parts and equipment that were broken, damaged or badly worn, were in good working condition;

---

[5] Ultimately Plaintiff's position was filled by a twenty-eight year old Anglo male. Evidence that an employer only temporarily replaced the plaintiff with an older employee can create an inference that a temporary replacement was made in order to ward off an age discrimination claim.  *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 561 (10th Cir.1996). Here, the parties move to strike each others' affidavit evidence concerning what motivated the first replacement to leave the position.  I need not reach that issue, since I already assume that Plaintiff has met his *prima facie* burden on the ADEA claim.

(8)     knowingly left equipment in an unsafe condition; and

(9)     had lewd and pornographic magazines and materials in his company truck, in his desk and in his file cabinets.

*Doc. 44* at 1-2; *see also id.* at 11-12.  Defendant adequately articulates a legitimate business reason for the termination, specifically that these "actions jeopardized the public safety, were fraudulent and dishonest, and were not merely careless or inadvertent, but indicated a conscious disregard for safety, ethical standards, and the interest of his employer."  *Id.* at 1.

### D.  Plaintiff Fails To Demonstrate Pretext

The burden now shifts back to Plaintiff to demonstrate that the proffered reasons are pretextual, either by showing the a "discriminatory reason more likely motivated the employer or . . . that the employers proffered explanation is unworthy of credence."  *Bullington v. United Air Lines, Inc.,* 186 F. 3d 1301, 1317 (10th Cir. 1999) (quotations and citations omitted).  "Pretext can be shown by such weaknesses, implausibilities, incoherencies, or contradictions in the employers proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Morgan v. Hilti, Inc.,* 108 F. 3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted), *see also e.g., Munoz,* 221 F.3d at 1167.  A "*prima facie* case of discrimination, combined with sufficient evidence of pretext, is sufficient as a matter of law to show intentional discrimination."  *Munoz,* 221 F.3d at 1167 (citing *Reeves*).

Plaintiff contends that he has come forward with evidence to demonstrate pretext by the employer.  A great many of Cordova's assertions of dispute are just that - assertions, not evidence.  In response to the "undisputed facts" submitted by Defendants, Cordova either fails to address a fact, or does not directly respond to the specific fact asserted by PNM in the pertinent

numbered paragraph.  *See* FED. R. CIV. P. 56(e).

Moreover, the Tenth Circuit recently reiterated that not all undisputed facts will preclude the entry of summary judgment.

> "[T]he substantive law will identify which facts are material.  ***Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.***"  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

*Bartell v. Aurora Public Schs.,* ___ F.3d ___, 2001 WL 984719 (10th Cir. 8/21/01) (emphasis added).

Plaintiff focuses much of his "pretext" evidence and argument on an abrasive management style of supervisor Deckard toward employees, including threats to fire them.  Cordova maintains that he had an acrimonious relationship with Deckard in the months preceding his termination resulting in Cordova's 1998 discipline for insubordination.  However, as discussed below, the investigation leading to the discovery of the problems with Plaintiff's work was triggered by a wholly objective and external event.  Deckard was not involved with the triggering event.  The immediate investigation revealed serious omissions by Plaintiff, not his first offense, and one which Plaintiff concedes was sufficient to justify his termination.  The problems Defendant discovered potentially subjected PNM to civil and criminal penalties.  The further investigation revealed even more problems with Plaintiff's work.  Though Deckard may have been involved in requesting a further comprehensive audit of Plaintiff's work, he did not make the decision to fire Plaintiff.  Even if Deckard had recommended dismissal, three others concurred in that recommendation and the ultimate decisionmaker did not act merely a "rubber stamp" in

authorizing Cordova's termination.  Finally, Plaintiff's assertions of dissimilar treatment are

without merit or unsubstantiated.  These key undisputed material facts, supported by admissible

evidence, are dispositive of Defendant's entitlement to summary judgment on the federal claims.

**(1)   The investigation and subsequent audit of Cordova's work were triggered by a wholly objective and external event.**

Neither party provided the Court with a map of the PNM gas line at issue, but apparently

the "Transwestern transmission line" is a main gas line that runs near Clovis and Portales.  At

various points there are stations of different names that either regulate the flow of the gas and/or

have taps that divert the gas into a different line to be delivered to the towns served.

While Plaintiff was on vacation in July 1999, the Gas Control Office in Albuquerque noted

that the pressure at the Portales "feed" near the Transwestern Border Station "had crept up to the

alarm limits."   The Albuquerque Office reported the pressure problem to the Clovis Office and

asked for the situation to be investigated.  The Transwestern Border Station is one of the areas

for which Plaintiff was responsible, and the station is supposed to cut gas pressure down to 200

"psig"[6] as it makes its way to Portales.  Because Plaintiff was on vacation at the time, Tom

Sanders, a Gas System Technician from Roswell, was called in to assist and he inspected the

Transwestern station on July 12, 1999.  *See* Doles1, ¶¶5, 9-10 & Exh. B-1(S); Doles2, ¶10.a.

Neither party indicates who called in Sanders to investigate what was going on at that station.

Nevertheless, there is no evidence that the person who did so had anything to do with the

triggering event, and furthermore PNM was obliged to look into the matter.

---

[6]  Presumably "pounds per square inch gauge."  *See* 49 C.F.R. § 171.8

**(2)** **Investigation And Subsequent Audit Revealed That Plaintiff Potentially Exposed PNM To Penalties And Created Potentially Unsafe Situations**

The "equipment for which Cordova was responsible is critical to the control of gas pressures flowing downstream into populated areas. Overpressure potentially can lead to the failure of pipelines and related equipment, resulting in blowing gas, explosion and fire." *Doc. 44,* at 3 (¶6); *see also e.g., id.,* Exh. A (Plf. Depo. at 144). Near the Transwestern Border Station Sanders discovered a "relief valve" was set above 300 psig when the maximum allowable pressure was 200 psig. According to Doles, this was not only a dangerous situation, but also a violation of State and Federal pipeline safety regulations.

Sanders also "reported that the relief valve was caked with dirt and it did not appear that it had been tested for a long period of time." Doles1, ¶12 & Exh.B-1(S). Indeed, Plaintiff testified at his deposition that contrary to company policy he had *never* inspected the relief valve from the time it was installed in 1994. Plaintiff relies on advice he received from a former supervisor who supposedly had told him it needed no such inspection. Cordova acknowledges, however, that the former supervisor left the company in 1982, well before the relief valve was installed. Instead of noting that the relief valve was present but was not inspected, Plaintiff filed his reports as though the relief valve did not exist. *Doc. 44,* Exh. A (Plf. Depo. at 107-10).

Sanders also found problems with one of the regulators at that site and a leak in this badly worn regulator caused the alarm to sound. Doles1, ¶ 12. Plaintiff testified that he conducted an internal inspection of the two regulators ten months earlier and that they were "OK," but he does not dispute the Sander's observed condition of the equipment in July 1999. *Doc. 44,* Exh. A at 107; *Doc. 45,* Exh. 4 at ¶¶ 26.v.-26.v.iii.

Cordova concedes that as Senior Gas Technician, it was ***his*** responsibility to inspect, operate, and maintain the system, including repairs, and to complete accurate reports for his supervisor. *Doc. 44,* Exh. E (Attachment E-1); *id.,* Exh. A (Plf. Depo. at 38-44). Nor does Cordova seriously challenge that his failure to ever check the Portales relief valve and having it set at the wrong pressure not only violated company policy but also exposed his company to potential civil and criminal penalties. *See Doc.* 44, at 3 (¶5); Doles1 at ¶47 & Exh.B-20; *Doc. 45* at 4-5 (¶5); *id.,* Exh. 4 at ¶¶ 26.iv.-26.viii; *see also Doc. 44,* Exh. A (Plf. Depo. at 82-83).

Cordova attempts to deal with this evidence by moving to strike the Doles' and Deckard exhibits, which I rejected above. Plaintiff also moves to strike the substance of some of the Doles1 and Deckard affidavits, arguing they contain impermissible legal conclusions, hearsay, lay opinions, and/or speculation. Yet Doles' affidavit plainly sets forth the foundation for why Sanders conducted the investigation and his own involvement in reporting the results of Sander's investigation. Plaintiff also contends that Doles' observations about Sander's findings are hearsay and his statement that failure to properly set the correct relief valve pressure constituted a "violation of state and Federal pipeline safety regulations" is an impermissible legal conclusion. *See Doc. 53* at 4-5 (challenges to paragraphs 11, 12, 15 of Dole1). These arguments are without merit.

As noted above, Plaintiff's affidavit testimony does not contradict Sanders' observations in the reported deficiencies in his work uncovered by the subsequent audit. Rather, Cordova in his affidavit tries to minimize the degree of severity of such deficiencies. Cordova does not dispute that incorrect pressure settings violated regulations nor that failures to check the relief valve and to properly set pressures could create a dangerous situation and were contrary to

written company policy. A party should not be permitted to strike competent evidence which is in fact material and undisputed. To do so would contravene FED. R. CIV. P. 56(e) and the very purpose of summary judgment, to make an initial determination "whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact." *Anderson,* 477 U.S. at 250.

Cordova also attempts to deal with this evidence by maintaining that there was in fact no danger because the system could handle 300 psig of pressure. This assertion does not contradict that his actions were in violation of company policy, however. He further asserts that prior inspections by the Department of Transportation ("DOT") of his work did not result in any citations to PNM. This detail does not negate that Cordova's actions and omissions were in fact in violation of federal regulations.

**(3)   This Was Not The First Time Problems With Plaintiff's Work Were Found**

Plaintiff asserts that evidence of pretext can be found in that the July 1999 investigation and audit were the "the first and only negative evaluation of his work." *Doc. 45* at 20. The record and Plaintiff's own testimony contradicts this assertion. During annual inspections by the New Mexico State Corporation Commission in 1992 and 1995, problems were found in Plaintiff's areas of responsibility. *See* Doles2, Exh. B-1(S), B-2(S). Indeed, in an April 1997 response to a measurement audit, it was Cordova who divulged that he had omitted pertinent information on an inspection form in 1996. Doles1, Exh. B-12(S). Further, Doles recounted that

> I often sampled some of Mr. Cordova's reports and found errors in
> them. I discussed these errors with Mr. Cordova and his
> supervisor, (Mr. Barfield and Mr. Deckard). Typically Mr.
> Cordova would state that he did perform the inspection properly
> but had recorded the information incorrectly as he transferred the

13

> information from field notes.  I discovered and addressed these
> errors repeatedly over the years. . . .  Attempts were made by Mr.
> Deckard to assist Mr. Cordova in correcting the reoccurring
> problem of errors with his paperwork.

Doles2 at ¶5.b.  In fact, Plaintiff corroborated numerous instances in which he "forgot" to note

something pertinent in a report or erroneously noted other information.  *See Doc.  44,* Exh. A

(Plf. Depo. at 93, 104-06, 120-22, 127-28, 132-33, 145).

Moreover, ten months prior to the Portales incident, Plaintiff had been disciplined for

insubordination and "placed on positive discipline with an oral reminder that will expire" in six

months.  Thus, in October 1998, Cordova was cautioned that "[a]ny future violations of policy or

supervisors request will result in furthur (sic) disciplinary action up to and including termination."

*Doc. 44,* Exh. H-50 (exhibit to Plf. Depo).

### (4)   Plaintiff's Additional Pretext Arguments

Cordova testified that he had orally informed Deckard of safety problems with another

border station in Clovis and had been ignored.  Taking the light most favorable to the non-

movant, I will assume this to be true.  Cordova is convinced that Deckard therefore

> made up his mind to fire me on July 19, 1999, but had to find a
> pretext to cover up the real reasons, to wit:  retaliation for
> continuing to bring safety issues regarding the Clovis Border station
> and my questioning him [in April 1999] on disposal of company
> property at pennies on the dollar, and because of my age and ethnic
> origin.

*Doc. 45,* Exh. 4, ¶ 20.  Thus, it is Cordova's belief that he was not fired immediately in order to

broaden the investigation in an attempt to find even more legitimate reasons to justify what was in

reality a discriminatory termination.  Plaintiff attributes this "plot" to Deckard, Doles and Diana

Morris, PNM's then-Area Manager of the N.E. Region.

Because Deckard and Doles had signed off on Cordova's DOT reports regarding the maintenance of the Transwestern Border Station, Plaintiff speculates that they sought additional evidence supporting his termination to cover up Deckard's and Doles' own failures in reviewing Cordova's work. Cordova surmises that this was the reason why Deckard allowed the extensive audit of Plaintiff's work, which according to Cordova revealed only "minor problems." *See Doc. 45* at 16. Yet Plaintiff's subjective belief that Morris, Deckard, and Doles were conspiring against him is simply insufficient to create a genuine issue of material fact. *Ortiz* at n.11. Assuming Deckard wanted Plaintiff terminated for an unlawful purpose, I have only Cordova's unsubstantiated assertion that Deckard was the one who made the decision to fire him. All of the admissible evidence indicates, however, that Deckard was not involved in the termination decision. Deckard testified that he "did not participate in the decision to terminate Cordova's employment . . . nor did I recommend his termination at any time." *Doc. 44,* Exh. E, ¶ 12; *see also id.,* Exh G (Deckard Depo. at 64, 113-14). Morris testified that Deckard never recommended to her that Plaintiff be terminated, nor did anyone else make that recommendation to her. *Id.,* Exh. F (Morris Depo. at 60).

PNM identifies Morris, Summers, Callahan and Christopher as the relevant decision makers. *See Doc. 46* at 6. There is no admissible evidence to the contrary. Morris attested that it was she, who in August 1999, made that recommendation to her supervisor Danny Summers, Director of Regional Operations. Summers took the recommendation to his supervisor, Vice-President Melvin Christopher. *Id.* at 60-61. Janelle Callahan, Senior Human Resource Consultant also concurred with Morris' and Summers' recommendation in mid-August to immediately terminate Plaintiff's employ. *Doc. 46,* Exh. F. ¶ 4. Vice-President Christopher

approved the recommendation and made the termination decision.  *Id.* at ¶ 5.

Even if Deckard had recommended dismissal to Morris as Cordova intimates, Plaintiff ignores the fact that three others also recommended Cordova's termination to Vice-President Christopher.  No allegation and certainly no evidence show that  Morris,  Callahan,  Summers and Christopher were "simply a rubber stamp or conduit for an employment decision" made in reality by Deckard, the one who allegedly harbored discriminatory intent.  *See Kendrick,* 220 F.3d at 1231.

Plaintiff characterizes problems uncovered by the audit as "minor" and provides his own explanation for why things occurred the way they did, or places concomitant responsibility on others.  *See Doc. 46* at 15; *id.,* Exh. 4.  Yet it is the "facts as they appear to the person making the decision to terminate plaintiff" that are relevant for the pretext issue, not the employee's subjective evaluation of his or her performance.  *Kendrick,* 220 F.3d at 1231.  Even Plaintiff admits in a response to an interrogatory that his employer "could have terminated me just on the Portales w/l incident."  *Doc. 44,* Exh. I (answer to No. 11).

### (5)    Assertions of Dissimilar Treatment Are Without Merit Or Unsubstantiated

#### (a) When Compared to Supervisory Employees

Plaintiff contends that Deckard and Doles shared in the fault because they had reviewed his work.  Plaintiff complains of disparate treatment on the basis that Morris, Deckard and  Doles should have been terminated rather than given "reminders" from PNM."  *Doc. 46* at 12.  This argument is unavailing.  To be similarly situated, the three must deal with the same supervisor, be subject to the same standards covering performance evaluation and discipline, and have violated work rules of comparable seriousness.  *E.g., Kendrick,* 220 F.3d at 1232.

16

Plaintiff's responsibility included inspection, operation, and maintenance of the system, including repairs, and completion of accurate reports for his supervisor concerning the condition of the stations. As Plaintiff's direct supervisor, Deckard was tasked with *reviewing* Cordova's reports. As a matter of common sense, a supervisor must of necessity rely on the person charged with the actual operations and maintenance to accurately complete those reports. An oversight by a supervisor in failing to notice an omission on an employee's report is hardly comparable to the that employee's *deliberate* inclusion in a report of information known to be inaccurate and deceptive. Morris and Doles were involved in even more attenuated supervisory roles which would make them even less culpable for failures to detect deficiencies in Plaintiff's work.[7]

### (b) When Compared With Other Employees In Similar Positions

Plaintiff declares, "White anglo-saxon employees' (sic) whose negligence caused a major gas explosion in Portales causing major lose (sic) of life and property were not discharged by PNM." *Doc. 45* at 12. Yet, Plaintiff's only support for this assertion is his affidavit testimony. *See id.* at 4, ¶ xi. In response, Defendant PNM submits the affidavit of its General Manager who testifies that the persons involved in the 1982 explosion in Portales were Hispanic and were actually employed by Southern Union.[8] *Doc. 46,* Exh. C.

---

[7] Indeed, Morris acted in a management capacity for the entire Clovis office, and it appears that she was assigned to the Clovis office only temporarily to help alleviate the acrimonious environment between Deckard and his subordinates. *See Doc.* 45, Exh. 6 (Morris Depo. at 24-25). It is not clear where Doles' position would fall on an organizational chart, but Plaintiff's own allegations support Doles' description that as an engineer with district-wide responsibilities, he is supervisory in the sense that he periodically reviews Plaintiff's paperwork. *See Doc. 45* at 16.

[8] Southern Union was technically another company at the time. *See Doc.* 45, Exh. 4 at ¶ 1; www.pnm.com/About/history.html ("In 1949, PNM sold its gas operations to Southern Union Gas Company of Dallas, Texas. These Southern Union New Mexico operations became the

Thus, the prior incident took place decades ago and Plaintiff submits no evidence that the applicable regulations or company policies were in place at that time, much less precisely what caused the accident. Plaintiff also fails to demonstrate that any of those involved in the 1982 explosion had similar discipline records. Thus, Cordova ignores the impact of his 1998 discipline for insubordination in making the "similarly situated" comparisons. Moreover, PNM submits uncontradicted evidence that other employees, including non-Hispanics, who failed to follow company policy concerning inspections and accurate reporting were ***immediately discharged*** without progressive discipline in the 1990's for jeopardizing public safety. *Doc. 46,* Exh. D; *Doc. 44,* Exh. C.

Finally, Plaintiff contends in his affidavit that undertaking the expanded investigation or "audit" was unprecedented, that no "audits of any employees work had taken place in my twenty-five years experience with PNM." *Doc. 45,* Exh. 4, ¶ 26.viii. The record belies with unsupported assertion. *See Doc. 44,* Exh. F (Morris Depo. at 62); *Doc. 46,* Exh. E (Deckard Depo. at 56-57).[9] Because Plaintiff fails to produce sufficient admissible evidence to support a finding of pretextual motive for Cordova's termination, Defendant PNM is entitled to judgment as a matter of law on the federal claims.

---

Gas Company of New Mexico. In 1985, as part of settlement of federal antitrust litigation against Southern Union, PNM reacquired Gas Company of New Mexico.").

[9] Plaintiff also argues that other "white anglo-saxon employees who had adult oriented materials in their possession were not disciplined by PNM." *Doc. 45* at 12. He specifically mentions Deckard. *Id.* at 4, ¶ x. However, as noted above Deckard is not similarly situated as he is Plaintiff's supervisor and it is not necessary to consider the pornography Plaintiff possessed in evaluating the work performance issues that justified his discharge.

# IV.  State Claims Are Without Merit

## A.  Plaintiff Was An Employee At-Will, Subject To Immediate Dismissal

Counts III and IV of the complaint are claims of breach of express and implied contract. Plaintiff asserts that the language of the "employee handbook" mandates that PNM terminate him: (1) for cause; (2) after providing for notice and an opportunity to be heard; and (3) after a course of progressive discipline.  He also alleges that the company's practices gave rise to an implied contract - specifically, the use of progressive discipline and refraining from terminating long-term employees without cause.

PNM submitted its "Human Resource Manual" ("Manual") under seal.  The general section of the Manual begins with a sentence in bold and large type that states:

## "This manual is not an employment contract, either express or implied."

It further provides that:

> Employment with the company is at-will.  That is, either the
> employee or the employer may end the employment relationship at
> any time, with or without cause, and with or without notice.

*Doc. 44,* Exh. C (attachment C-1(S)).  The above Manual is dated as issued 4/24/92 and revised 4/1/94, and plainly applies to the period preceding Plaintiff's dismissal.  If, as Cordova asserts, a prior handbook said nothing about employee status, Plaintiff would still be terminable at will unless he could show an "express contractual provision stating otherwise" or that there was something to his employment "beyond performance of duties and payment of wages."  Plaintiff proffers nothing in this regard.  *See Garrity v. Overland Sheepskin Co. of Taos,* 121 N.M. 710, 713 (1996) (quoting *Hartbarger v. Frank Paxton Co.,* 115 N.M. 665, 668 (1993), *cert. denied,* 510 U.S. 1118 (1994)).

Similarly, the Manual does not create an absolute entitlement to progressive discipline prior to termination. "Falsifying Company records or documents," among other things, "may be cause for immediate dismissal and possible notification of civil authorities. *Infractions of this type are not subject to the Positive Discipline Program.*" *Doc. 44,* Exh. C (attachment C-2(S), emphasis original, issued 4/24/92 and last revised 6/6/97; *see also id.* (attachment C-3(S)). The problems with Plaintiff's work included failing to properly fill out reports as required[10] and Plaintiff had been disciplined received notification of possible termination if other incidents were to occur in the future.

As in *Garrity,* "[g]iven the express reservation of the right to terminate an employee for any reason [and without progressive discipline in certain instances, Defendant's] written personnel policy cannot be said to have created any reasonable expectation of an implied contract" under New Mexico law. *See Garrity,*121 N.M. at 714. Furthermore, New Mexico does not recognize a cause of action for breach of good faith and fair dealing under an at-will employment contract, and allegations of longstanding corporate practices, such as relocation before discharge or retention of long-term employees absent cause for dismissal, cannot form the basis of an implied contract. *Burke v. BDM Technologies, Inc.,* 172 F.3d 62, 1999 WL 40973 (10th Cir. 1999) (unpublished) (citing *Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, *cert. denied,* 488 U.S. 822 (1988); *Borugeous v. Horizon Healthcare Corp.,* 117 N.M. 434 (1994); and *Hartbarger*). Accordingly, Defendant is entitled to summary judgment on Plaintiff's breach of

---

[10] Plaintiff moves to strike assertions that his records were "falsified" as inadmissible lay opinion. Again, as noted above, Plaintiff does not dispute the mistakes in his paperwork and in fact testified about them.

express and implied contract claims.[11]

### B. Retaliatory Discharge

Count VI is a claim for retaliatory discharge, but Plaintiff did not bring a claim of retaliatory discharge before the EEOC. *See Doc. 44,* Exh. 61. Under New Mexico law, the claim fails for a number of reasons.

Plaintiff maintains he was discharged in retaliation for reporting safety concerns regarding the Clovis station to Deckard and Doles and for expressing his concern to Deckard that he was

---

[11] Even if there were an implied contract requiring cause to fire Cordova, the discussion of the federal issues demonstrates that PNM had ample grounds for terminating him. Two recent unpublished decisions from the Tenth Circuit applying New Mexico law reach the same conclusion in similar cases. I will describe them in relevant detail rather than attaching them.

In *Yeitrakis,* the Court noted that if good cause justified dismissal, "there is no need for us to determine whether the underlying employment agreement was 'at will' or 'for cause,' because dismissal would be appropriate under either." *Yeitrakis v. Schering-Plough Corp,* 51 F.3d 287, 1995 WL 151799 at *2 (10th Cir. 1995). Yeitrakis was fired for, among other things, falsifying records of his field activity. He claimed these were simply mistakes and/or denied the justifications were correct. The Tenth Circuit noted that under *Kestenbaum v. Penzoil Co.,*108 N.M. 20 (N.M. 1989), *cert. denied,* 490 U.S. 1109 (1989), the inquiry is whether the employer "'had reasonable grounds to believe that sufficient cause existed to justify [its] actions in discharging the plaintiff.' . . . Consequently, [the employer] need not prove that its assertions are correct, it must merely demonstrate that it acted on a reasonable belief that cause existed" to justify the discharge. The Tenth Circuit concluded there was substantial evidence of the same. *Yeitrakis* at *3.

In *Baucom,* the plaintiff's new supervisor transferred him to a new position. After Baucom's transfer this supervisor game him "several unfavorable evaluations" within a year. Baucom thought the evaluations were unfair and that his supervisor wanted to replace older employees with younger ones. At a safety meeting which the supervisor did not attend, Baucom made a comment disparaging safety measures the company was taking. Baucom's comment was relayed to his supervisor, who found this to be "the last straw." Baucom was fired immediately. He argued that "he had an implied employment contract with [Defendant] which entitled him to progressive discipline and dismissal only for cause. The Tenth Circuit found that an employer's statement gave rise to an implied contract. "Nevertheless, summary judgment [was] appropriate because the record does not demonstrate a genuine issue of material fact concerning the existence of proper cause for [his] dismissal." *Baucom v. Amtech Systems Corp.,* 131 F.3d 151, 1997 WL 748668 *1, *5-*6 (10th Cir. 1997).

allowing only select employees to take advantage of a company sale of old computers.  First, Plaintiff's is required to show that in complaining he performed an act that public policy authorizes or encourages.  *E.g., Garrity,* 121 N.M. at 714 (and authorities cited therein).  In Plaintiff's Complaint he relies on the New Mexico Occupational Safety and Health Act.  Yet he drops that reference in his brief.  New Mexico decisions do recognize retaliation for "whistleblowing" by reporting "unsafe working conditions to the appropriate public agency."  *Id.* at 716 (citing *Gutierrez v. Sundancer Indian Jewelry*, 117 N.M. 41, 47 (Ct. App. 1993), *cert. denied,* 117 N.M. 121 (1994); *see also Weidler v. Big J Enterp., Inc.,* 124 N.M. 591 (Ct. App. 1997) (employee complained to OSHA).  Indeed, the New Mexico courts have discussed whether failure to report suspected drug use to appropriate public officials constitutes furthering a public interest.  *See e.g., Garrity*, 121 N.M. at 716 (answering in the negative under the circumstances of that case).  I have found no decision that extends the OSHA-type public safety complaints to situations where the complaint is made solely to the employee's immediate supervisors.

To succeed on his retaliation claim, Plaintiff must also prove causation between the complaint and the discharge.  *E.g., Shovelin v. Central New Mexico Elec. Coop., Inc.,* 115 N.M. 293, 303 & n.8 (1993).  There are two reasons why Plaintiff fails in this regard.  For the reasons discussed in connection with the federal claims, no evidence is submitted that the decisionmakers, and particularly Christopher, knew of the alleged safety complaints.  "An employer cannot fire an employee in retaliation for actions of which the employer is unaware."  *Weidler,* 124 N.M. at 599 (quoting *Lihosit v. I & W., Inc.,* 121 N.M. 455, 458 (Ct. App.), *cert. denied,* 121 N.M. 444 (1996)).  Additionally, Plaintiff fails to show pretext to establish that the "cause" for his discharge was retaliatory.  *See Weidler,* 124 N.M. at 603.  Therefore, I find Defendant is entitled to

summary judgment on the retaliation claim.

### C. Prima Facie Tort

Plaintiff's final claim in Count V for *prima facie* tort incorporates his allegations concerning his discharge as support for this claim. Yet decisions from this district stand for the proposition that *prima facie* tort is not applicable to employment-at-will situations.

> Although *prima facie* tort can occur in a workplace setting, *see Beavers v. Johnson Controls World Servs., Inc.,* 120 N.M. 343, (Ct.App.), *cert. denied,* 120 N.M. 68 (1995), it is unlikely that it was meant to interfere with a company's prerogative to select its employees or independent contractors.

*Ewing v. State Farm Mut. Auto. Ins. Co.,* 6 F.Supp.2d 1281, 1291 (D.N.M. 1998); *see also Hill v. Cray Research, Inc.,* 864 F.Supp. 1070, 1079 (D.N.M. 1991) (*prima facie* tort not available where plaintiff alleged breach of an implied contract that termination would only be for just cause or in tort for retaliatory discharge); *Yeitrakis v. Schering-Plough Corp.,* 804 F.Supp. 238 (D.N.M. 1992) (concluding as it did in *Hill* "that *prima facie* tort is unavailable to remedy the termination of an at will employee, even where he is terminated for bad cause").

Furthermore, a *prima facie* tort claim will not lie as a substitute where Plaintiff fails to establish his other theories of relief.

> [P]rima facie tort should not be used to evade stringent requirements of other established doctrines of law." . . . **To the extent that Stock's claim of prima facie tort does not duplicate the other torts alleged in the complaint, it would simply be a means of evading the requirements of the doctrines underlying those potential torts. This is an improper use of the tort.**

*Stock v. Grantham,* 125 N.M. 564, ___ 964 P.2d 125, 136-37 (Ct. App.) (emphasis added; citations omitted), *cert. denied,* 125 N.M. 322 (1998).

Wherefore,

**IT IS ORDERED THAT:**

1.      Plaintiff's Motion to Strike *(Doc. 53)* is DENIED on the merits as to the issues

addressed in the opinion and DENIED AS MOOT as to the remaining issues;

2.      Defendant's Motion for Summary Judgment *(Doc. 43)* is GRANTED;

3.      Defendant's Motion to Strike *(Doc. 49)* is DENIED AS MOOT;

4.      The trial set to commence November 5, 2001 in Roswell is hereby VACATED;

        and

5.      A final judgment enter concurrently herewith.


_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent